May it please the court, your honors, good morning. My name is Robert Powell. I represent the plaintiffs David, Melissa Burke, and Clifton Farina. Melissa and Clifton being the biological parents of DF. I think the first thing is I want to point out I have several causes of action to address here, claims for relief to address here, so I'm going to talk quickly but try to avoid speaking like the FedEx man. Without a court reporter, I can probably proceed fairly quickly. I think the first and largest issue is the removal of Brittany, the taking into protective custody of BF. And I think that the court essentially usurped a jury function in making the ruling that it did. And you'll find most of the court's basis for its reasoning on what is excerpt record page 10. And what it contains are facts that are just wrong, flat out wrong, or are disputed. It contains facts that do not exist in the record anywhere and that do not amount to an imminent risk of serious bodily injury in any event. As Rogers v. St. Joaquin. Say more. What do you mean? Pardon me? Say more. What do you mean when you say erroneous or disputed facts? What are those erroneous facts? Yes. Okay. I'll start right down there. It's again on page 10 of the excerpts of record. It starts right off by saying that Mr. Burke repeatedly made inappropriate comments such as calling her Big Titty Mama. No evidence of that in the record other than that he had said Big Titty Mama at one point, nothing about repeatedly. Had struck her numerous times on July 3rd, 2005. That's the instance where there's another officer who's present in the house after these alleged strikings and makes no mention of it in his report. Doesn't report it. It says that Mr. Burke had been arrested for beating up her stepsister. Absolutely no evidence in the record of that. Had been violent toward her mother. That was a comment by Brittany about pushing and broken dishes not explored in any way, shape, or form by the questioning lady at the Calico Center. And then it says told BF that he would, quote, beat her ass if she did not provide the right information regarding Maciel at the interview. That's some hyperbole by a very upset father, the one who scheduled the Calico, who when it had to be rescheduled, rescheduled it. Who brought the child and, according to BF's own statements in her Calico interview, said the reason that he was pushing this was because people like that, there's something wrong with them. Someone who would take a 14-year-old girl into an apartment and have sex for 10 days. It says here that Detective Foster observed Mr. Burke's angry, impatient demeanor. However, Mr. Foster himself testified in deposition that at the time he didn't think anything of it. It was later. Now, again, remember, Mr. Burke's there. He has no idea they're investigating anything to do with sexual abuse. He's saying, I've got to get to work. I've got to get to work. Offers to bring her back later. Of course, Detective Foster has his own agenda. And I've spoke about that at length in the papers. And there's evidence that he had his own agenda of a bit of a personal vendetta going on. And then the Court essentially makes the finding, a finding reserved for the jury, that Detective Foster had a reasonable belief that the child was in imminent danger of serious bodily injury. It says, were she to be returned to the custody of Mr. Burke. Well, that ignores entirely the many requirements in Wallace. Let me ask you this. So you say there's a tribal issue of fact here. My understanding is, and you can correct me if I'm wrong, okay, there's the constitutional violation that you're alleging. Yes. Right? And then they were also seeking qualified immunity. Correct? And in footnote three of the district court's order, she says, well, qualified immunity is essentially the same question, reasonableness question, as on the constitutional violation. Correct? Correct. All right. So just follow me for just a second. If you say that there is a tribal issue of fact, for purposes of just a pure constitutional violation, and that you didn't even have to deal with qualified immunity, the case should go forward. Okay? Let's just deal with, let's recognize that for a moment. Now I want to switch to qualified immunity. And for qualified immunity purposes, you can say, well, if there are any factual disputes here, we're going to resolve them all in favor of the nonmoving party, the plaintiff. Did you say you can say that? You can say that under cats. You can just resolve all for purposes of qualified immunity only. You say we're going to take all the evidence in light most favorable to the nonmoving party, and we're going to resolve all factual disputes in favor of the nonmoving party, and then ask, was the law clearly established, and ask whether a reasonable officer would have understood that in light of those facts, he would have been violating the plaintiff's constitutional rights. Okay. But here it seems like the law was, at least from my impression reading the case, the law seems to be pretty clearly established that you need a warrant to take a child into custody. Okay. Now, if you look at the facts, isn't there some, isn't it kind of a close question about whether or not he had a reasonable basis to take the child into custody for purposes of qualified immunity? And I submit to you that it is not. That's a legal question. I agree. Well, it's a legal question, though it has to be based on. It's a judge question. Right. But it has to be based on those facts taken in the light favorable to the nonmoving party, which is, I'm sure we made clear in the brief. I don't think that happened at any point in the district court proceedings. But the they did not raise clearly established as well. I wanted to point that out. That was not raised by the defendants either. And so to answer your question, I do not believe that these facts remotely constitute an imminent risk of serious bodily injury. Looking at the timelines here, looking at the nature of the conduct, there had never been any prior serious bodily injury to this child. The conduct is the touching of a breast. If you believe the child, whose statements in the interview are all over the board, as I pointed out in the brief, she claims at one point it happened every couple days. And I gave you examples of, well, let's say a couple means two and a couple means four. That's between 91 and 182 different touches in a one-year period. Counsel, the point is not, in my opinion, whether the allocations are true. There was information given to the officers by BF during the interview, regardless of the ultimate truth. Foster was entitled to rely on her both for the violation and for immunity purposes. So the point isn't whether it was absolutely true. And you spent a lot of time in your brief arguing that Foster should have known BF was lying. But why shouldn't Foster have believed her? Even if she was a troublemaker, it was not plainly incompetent to rely upon her. Well, but then if you're going to rely on her, then I believe that you have to rely on her statements that even given if she went home after having accused her stepfather of touching her on the breast, she herself says the worst that he would do is yell. And to answer the Court's question about the issues of credibility that I might have addressed, I may have fallen into a trap caused by the district court's ruling on page seven of its judgment because the court says there was a lack of any indication of the falsity of BF's claims. And I point out to the court countless of them, and that all goes to the objective reasonableness of the reasonable police officer at that time and what they would have believed they were doing. So I can understand if the court decides there's tribal issues of material fact here, but I do believe that in terms of an imminent risk of serious bodily injury after a reasonable investigation, and then, of course, I think one of the hugest issues in this case, whether or not there was least intrusive means explored because the mother was accused of nothing. There is quite an effort by the defendants to say that the child talked about all this breast activity and then the mother confirmed it. But as I point out to the court, that's absolutely false. The child never once says anything about these alleged titty twisters. When they're having the conversation with the mother, that's what she's talking about. She has no idea what they're talking about. And how does this child – so when Foster comes back from that, if you buy that this two-hour wait and calling the mother should be considered in the decision to remove, then how can Foster reconcile that? How can he reconcile that? But I agree with the court. You don't have to focus on the credibility of it. You have to focus on the nature of it. And nothing in the nature of it amounts to a serious risk, imminent risk of serious bodily injury. What's the basis for the biological father's claim here? That's his daughter. He is essentially the same. Did he have custody of her? Yeah, he had joint legal custody of her. Absolutely. Absolutely did. And he's in similar shoes to Ms. Wallace. So the claim is that they should have called him and asked, hey, you think you should come and get your daughter? The claim in order is never should have taken the child in protective custody. If not, should have given her to mother and could have issued an EPRO on Mr. Burke if you believed he actually did something. And if not mother, because for whatever reason, I can't imagine, then the biological father. Absolutely. Absolutely. And I think that's what Wallace commands. In a case where the accusations were far more outrageous, including satanic ritual murder. And we don't have that in this case. And looking at my time, if I may go to the other just very briefly. Sure, sure. Okay. The warrantless arrest, as pointed out in the papers, that is their burden to have brought forth the evidence to diffuse or defeat what is clearly a tribal issue of material fact, which is a warrant issued a month or two months later than the date that the man was arrested and signed by a different judge than the other document that the other police officer, he calls the warrant. So there's many tribal issues of material fact there. On the excessive force claim, there is no disputed fact that the gun was pointed at Mr. Burke's head. The officer doesn't dispute that. He doesn't recall. And Mr. Burke had testified to it. I gather the whole concern of the district court judge was that there was a, I think she said it was a 60-pound pit bull. Right. And my response to that, Judge Peoz, was, well, you should have pointed your gun at the dog. Because, you know, the dog didn't bite the man. In fact, when the officer asked Mr. Burke, while with his knee and his back on the ground, to call his wife and get the dog, that's what he did, and the dog ran in the house. But he comes upon a man. The court made the distinction in the district court that this was a distinction between a suspect and a person for who a warrant has issued. And that's not the point of the cases. That's not the point of Robinson v. Solano County. It's about the inherent risk of pointing loaded weapons at people's heads when they pose no risk, no evidence of any prior violence to this officer, only misdemeanor convictions on his, the thing he called the arrest warrant. And yet you approach with a gun pointed at his head? I mean, that's where people get killed. False imprisonment, that's the issue of Ms. Burke being told, oh, you come down to the, the police station right now or I'm going to charge you with child endangerment. That inhibits liberty of movement when you have to go down to the police station. And I should mention, too, that although the defendants now, years later, say, well, and the court, district court says, oh, well, that was further investigation. Nowhere in any of the evidence presented to this court in this record is there any mention that Detective Foster is saying, hey, come down, I want to talk to you a little bit about this thing that came up today, this investigation involving your daughter. It's basically him commanding her to get down there. I addressed the intentional infliction of emotional distress claims in the brief, too. I'd like to reserve the little time that I have left. Okay. Thank you. Let's hear from the county and then we'll give you a chance to respond. Thank you. Hello, Your Honors. My name is Catherine Wheeler. I'm counsel for the County of Alameda, Mark Foster, and Deputy Bartholomew. I'd like to address three points here today. I'll start briefly with the warrant, the validity of David's arrest, go to Bartholomew's actions being covered by qualified immunity, and reserve the remainder of my time for the First Amendment issue. With regard to the issue of the warrant, we do not deny that the warrant system is a confusing one to people outside of the system. However, that does not diminish the legality of the warrant for David's arrest. I confess I had another one of these cases not too long ago. Maybe I forget, kind of a year or so ago, about warrant. Confusing, I think, not only to people outside the system but inside your system. That's correct. Maybe you've cleared it up since, but there may be a little work required to clean things up just so everybody knows what the rules are. I agree that there's probably more work that needs to be done. The clerical errors on the warrant and the warrant abstract are unfortunate, but they do not render the warrants invalid. Even if this Court deems the errors to be substantive and to render the warrant invalid, the arrest is still lawful because Foster had probable cause to arrest David for the misdemeanor charges of child molestation and sexual battery. Mr. Powell makes a statement that there are many material facts that need to be discussed with regard to this warrant issue, but the fact is, is that Foster, in taking the charge of these crimes to Senior Deputy District Attorney Roy Shungart, as well as Judge Peggy Hora, he had a probable cause declaration. He had a statement from the minor made in August, a month after the original protective order, or the original incident, and that set forth the reasons for the probable cause for the misdemeanor violations. And because there's probable cause, at a minimum, this is evidence of probable cause, so his arrest was lawful. Counsel, I hate to interrupt you, but I'm wondering about the evidence part of the analysis in the Mabee case. Why is this case any different than Mabee? This case is distinguishable from Mabee because the social worker in that case went to the home, I believe, several days or weeks before, went, had a recommendation that she was supposed to follow up with a juvenile court proceeding, and then decided on her own to go back to the residence. She made an unlawful entry into the home, took the children, took, and the officer knew, the officer that was with her, I believe, also may have known that there was no basis for the taking of the children. And so the court in Mabee decided that, or pointed out that it was really the delay between the investigation and the taking into custody without a warrant. In that case, there could have been time to go get the warrant in addition to the difference of facts with respect to the children not being physically abused or not being threatened. What in this case made the danger imminent? It would take a few hours to get a warrant. Well, practically speaking, the Calico interview, at the Calico interview, the minor in this case indicated that her stepfather had beat her just nine days prior for disclosing information or failing to disclose information about her runaway and about a matter that made her stepfather angry and a matter that her stepfather got heated about enough to tell her he was going to beat her ass if she didn't talk about it. Then if she had been released back home on that specific afternoon to her father or stepfather who would have again asked her what she testified to, did she do what she told him to do, what else did she discuss, why was she there so long, then you get another situation where maybe he is even more upset and more angry with her either because she's failing to tell him what she said or because she actually ---- That just sounds like all speculation. Well, actually, it's not speculation because this particular officer who was witnessing the interview by this child's interview specialist had 20 years of experience on the force and was actually designated to the Youth Family Services Bureau. So he was specifically trained to take care, to identify and notice youth victims of abuse and his interpretation of the circumstances and his prior knowledge of Mr. Burke gives him a basis that is reasonable to believe that she would have been abused and that her mother was not protecting her from any of that abuse. Do they have any obligation to call the mother and say, look, here's the situation, the stepfather's got to be out of the house before we'll let her back, let her go back? None of the case law at this point in time holds that there is an affirmative obligation, but I would say that in this particular case the circumstances are so distinguishable because we're at a neutral third-party location. The stepfather leaves. Foster has no choice but to have this child in his custody, goes five minutes down the road to the station and immediately calls the mother. Did he have to say, hey, will you kick your husband out of the house so that we can release the child back to you? I don't believe he has that affirmative obligation. How about calling the dad? Well, we know that he witnessed the minor speaking about the dad in the Calico interview and that she had said that there was some abuse going on there. What was the abuse there? The abuse there had also occurred a few weeks prior when she came home. The stepmother had history of hitting her and being verbally abusive toward her. But the point really is that the minor in this case said, you know, I don't actually like spending time with my dad. I spend time with him once a month for maybe a couple of hours. So at this point, the stepfather and the mother are really the sole providers for this minor, even though. But the fact that the child spends time with her natural dad, I have to tell you that this bothers me the most about this case. Rather than putting the child in protective cousin, not even call the natural father, who could well have said, I realize that his new wife didn't like the child and didn't like her in the house, and there was evidence as to that. But not to even call the dad, it seems to me to be quite unusual. Well, you know, the onus shouldn't just fall on the detective. The detective called the mother and had her come to the station. She didn't ever ask for Brittany to come back. She didn't say, hey, can you release her to the biological father. She didn't even give him information about the biological father. So she's divorced from him and it faded from him, so that's not surprising. But the fact they knew that she had a natural father, I mean, the biological father, and not to even call him and get a suggestion from him as to how the child might be handled other than putting her into protective custody. Well, at the time when Foster was continuing his investigation at the YFSB and had called Melissa, Melissa, when she came to the station, she effectively consented to the child being taken into protective custody, something that is corroborated the very next day by her discussions with CPS saying, go ahead and take her for 14 days. The mother didn't care, but the question is about the natural father, Carrie. Right. And my response to that is because Foster didn't have any feedback from the biological mother whom he could rely on for saying if they protested the child's custody that he would not have known to go to the biological father based on the consent of the biological mother. Go ahead, I'm sorry, Judge Nelson. No. And what did the officer know about the biological father from either BF Brittany or from her mother? I heard you say that she didn't like spending time with him and that she didn't spend very much time with him, like a couple of days a month. Right. What else did the officer know? The only thing the officer would have known at that day is what she discussed in her Calico interview. There is no testimony in the record that indicates that the biological father was part of the internal affairs investigation of the child's previous runaway because recall Foster also had met with the Burks with regard to the actual runaway in late June, early July. So in his dealings with the family on that, it was only with David and Melissa Burke, it was not with the stepfather. And what's the law on the obligation of an officer in performing an unwarranted, without a warrant, I'll say it that way, putting the child under protective custody to inquire as to both biological parents? The case law thus far does not put an affirmative burden on the officers. Maybe it does discuss the fact, or maybe it's Wallace, I forget, I'm sorry. Right. Wallace talks about the scope of the intrusion is reasonably necessary to avert that specific injury. Correct. And in that particular case, I believe you had the officer or the circumstances were so egregious that with the falsification of the social worker and the investigation having been a year and a half, over a year and a half, and old allegations and the time frame, or I'm sorry, the time frame for the actual eventual satanic ritual that was alleged by the crazy sister. In determining whether or not protective custody without a warrant is reasonably necessary, I'm wondering whether just on that general notion, reasonably necessary, what reasonable alternatives have to be investigated? I'm wondering under the circumstances, would it reasonably have been required? Would a reasonable person in Foster's position have asked Brittany, well, do you want to go with your natural father? Otherwise, the alternative is we're hanging on to you for a period of time or calling the natural father. Why is that not part of the obligation of Foster? Well, certainly the state of the law did not put him on notice that that was his obligation. Well, how about the notion that something is reasonably necessary? Now, under the circumstances, what's reasonably necessary may, of course, change. Why in this circumstance shouldn't Foster have inquired as to either or both Brittany or the father as to what alternatives might be available to protective custody in determining whether protective custody is reasonably necessary? I think that if there would have been a discussion, or if it would have been more in line with the court's other precedent in this particular line of cases, that perhaps he might have had an obligation to create that discourse. However, in this case, he has the mother there, he has the child there, and nobody's really objecting to anything, nor did they ever object to anything. Everybody just kind of rolled over and let this child be placed into the care of the state. So he would, protective custody, or I'm sorry, qualified immunity should apply in this case, because even if you take the fact that he should have taken additional steps or measures, he wasn't on notice that he should have. He was only on notice to have done exactly what he did, protect this child from imminent danger of serious harm. And just briefly in response to what Mr. Powell stated earlier, with regard to Deputy Bunnell, who visited the home and didn't report seeing Brittany bruised, there's actually testimony in the record by Foster at the record, excerpts of record at 89, sorry, at 68 to 70, that the deputy did not see Brittany bruised. Did not see her, requested to see her, was not allowed to see her. The minor herself in her Calico interview discusses briefly that an officer came, she was hit before and he left, and she was hit by her stepfather again afterwards. With regard to all he would have done is yell, I believe that we've shown through our analysis that the entirety of the Calico interview must be looked at and the professionalism and the experience of Officer Foster must be considered when you look at that one phrase in isolation versus the entirety of the case itself. Further, excessive force. Why was it reasonable to approach Mr. Burke with a gun pointed at him? He was being arrested for a misdemeanor. He was being arrested for a misdemeanor, but he also was distinguishable from the case in Robinson where the plaintiff was seen walking for several yards. It was clear that he was not armed. He wasn't being argumentative. He was being cooperative. In light of all of those circumstances, in this particular case, he's got David on the lawn, not really listening to him. David says he tried to put me in an arm lock. All of these different things are happening within a matter of seconds or minutes on the lawn with a pit bull within three to five feet of him. David is in control of the pit bull. I understand the way the district court took the facts is that the officer approached with the loaded gun. Well, the ‑‑ That is, he didn't pull out the gun after there was resistance or something like that. The facts are a little bit disputed. If you go in the light most favorable to the plaintiffs, the gun was drawn either from the beginning or at some point during the actual handcuffing. If you go in the light most favorable to the defendants, you have to say ‑‑ You can't do that on summary judgment. Well, actually, I believe they have cross‑moved for summary judgment. Did they cross appeal? I believe so. I'm not sure. They did not. Okay. Okay. That the deputy Bartholomew would not have been on notice per Robinson. Okay. Thank you. Thank you. I'm going to, again, proceed rather quickly, Your Honors. First of all, the burden of proving the warrant was valid is on the defendants. They didn't do that. It's not a question of whether he had probable cause. It's a tribal issue of fact on this warrant. That was their burden. The maid case, it was two days and it was a far more serious level of sexual abuse than touching on the breast. Anywhere from 90 to 182 times for anywhere from one to five seconds that the child described as, I don't think he meant anything by it. I believe Judge Fletcher, you asked about why didn't they get a warrant. But they don't get warrants in Alameda County. And I hope I was right on my Monell analysis, which was I didn't have enough space to deal with it, and that since it was kicked out on a constitutional violation, a non-constitutional violation finding, I'll be able to do that if, in fact, we are successful and remanded. How much evidence do we have in terms of Alameda County's practice with respect to warrants and not warrants? I just missed the first couple words. How much evidence do we have on the record with respect to Alameda County's practice with respect to warrants? You have the person most knowledgeable for the County of Alameda telling you that they don't use warrants. They don't need warrants. I quoted the treasurer of the Sierra Madre, and I think that about sums it up. They don't have training on federal laws as they're implicated in child abuse investigations. And I remind this Court that Moody v. Alameda County is ages old at this point. I think it's a 2003 or 2004 case. And you'd think that they would have learned something from that, but they apparently did not. I just want to make sure that we're all on the same page with what the law is. It's possible, depending on what the facts are, to find that there's qualified immunity with respect to the individual officer. Correct. But at the same time to find that there's a Monell claim because of the violation, and the county doesn't get qualified immunity. Who doesn't? The county. The county does not get qualified immunity. Correct. If the Court finds the constitutional violation, then there can still be a Monell liability proven. Okay. You asked about is there a burden on the officer, and I submit to you that Wallace has a very clear burden on the officer, and so do other cases, Croft v. Westmoreland, other cases that preceded it, Ram v. Rubin. You have to do a reasonable investigation. And how can it be a reasonable investigation? Although I submit to you it's probably happened ten times in this state while we've been in here this morning, that children are taken and you don't even bother to pick up the phone to speak to one of the parents and say, you know, I've got your kid here, they're saying this or that, you know, can we talk about that? So I think there's an obligation right in Wallace v. Spencer and the precedent. I'll point out, although this is not a social worker, this is a police officer, under the divisions that govern them there's a clear obligation to contact the parents as part of the reasonable investigation. It's not true, I don't believe what counsel said, that there was no choice but to take this child into protective custody. There was a lot of choices. It's just they weren't about to be explored, and that was because Detective Foster had a personal dislike of Mr. Burke because they bothered to call internal affairs in their despair over a missing diabetic daughter. A couple more points, Your Honor, if I can have just a minute or two more. And again, I want to reiterate, there's no allegation of Mom doing anything. In the Calico interview, the child says, I told Mom, and she told him to stop, and it stopped. Okay. Now, a couple more points. Very quick, I only have three on the piece of paper, Your Honor. Okay. Oh, the comment about Mother didn't ask for her child back. Mother doesn't have an obligation to know her constitutional rights. She knows her child has been taken by a police officer and she's in a police station, and there's no sign of any intent to returning that child. And the idea that she effectively consented on that next day, first of all, not relevant in any way, shape, or form to the removal decision made two hours or more earlier. And finally, the court asked about reasonable alternatives, and what are they? What would they be? And they are things like ask the non-offending parent to move out of the house or the offending person to move out of the house. Ask the non-offending parent to take the child and stay at a hotel. There's all kinds of alternatives. They weren't explored. Because, again, Alameda County, as Detective Foster's words, quote, we don't do warrants. Thank you, Your Honor. Okay. Thank both of you for nice arguments. Burke v. County of Alameda now submitted for decision.
judges: Nelson D. W., Fletcher W. , Paez